### NATIONAL LABOR RELATIONS BOARD v. WILTSE.

#### No. 11128.

United States Court of Appeals, Sixth Circuit.

Decided March 23, 1951.

As Amended on Rehearing June 1, 1951.

---

Duane Beeson, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, Bernard Dunau, and Duane Beeson, Washington, D. C., on the brief), for petitioner.

George Meader, Washington, D. C. (George Meader, Washington, D. C., John S. Dobson, Ann Arbor, Mich., on the brief), for respondent.

Before SIMONS, McALLISTER and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

The National Labor Relations Board filed its petition for enforcement of its order requiring respondent to reinstate workers alleged to have been discharged as a result of unfair labor practices in violation of the National Labor Relations Act, as amended; to cease and desist from discouraging membership in a union and from interfering with and coercing employees in the exercise of their right to engage in concerted activities; and to post appropriate notices. In answer, respondent submits that, under various provisions of the

920

Act, the Board was without jurisdiction to hear and determine the controversy; that respondent's operations did not affect interstate commerce, and that there was not sufficient admissible evidence in the record to sustain the Board's findings that respondent was guilty of unfair labor practices.

■ The National Labor Relations Act, as amended, known also as the Labor-Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., provides that no investigation shall be made by the Board of any question affecting commerce concerning the representation of employees raised by a labor organization, and that no petition of such an organization shall be entertained or complaint issued pursuant to a charge by a labor organization, unless such organization and any national or international labor organization of which it is an affiliate shall have filed with the Secretary of Labor copies of its constitution and bylaws and certain other information as to its procedures and finances, and distributed its financial statement to its members, and shall have filed with the Board affidavits of its officers that they are not members of the Communist Party. Section 9(f), (g), and (h) of the Act, 29 U.S.C.A. § 159(e), (f), and (g).

There was no proof in the proceedings before the Board, or in this court, that that union, here in question, had complied with the requirements of the above mentioned provisions of the Act. Failure to comply was not pleaded as a defense by the answer.

On the principal issue in this controversy, respondent contends that Section 9(f), (g), and (h) of the Labor-Management Relations Act is jurisdictional; that compliance with the requirements of this section by the union must be shown before the Board has jurisdiction to proceed; and that since there was no showing that the union had complied with this section, the Board had no jurisdiction to issue its complaint or enter its order in this case.

In National Labor Relations Board v. Greensboro Coca Cola Bottling Co., 4 Cir., 180 F.2d 840, 844, similar contentions were considered and determined. In that case,

in passing upon the argument that the Board was without jurisdiction to enter its order because the union had not complied with the above mentioned section of the statute, Judge Parker, speaking for the court, said: "The company's contention that the Board was without jurisdiction to enter the order is based upon an allegation in the answer before the Board to the effect that the union upon whose petition the complaint of the Board was filed had not complied with the requirements of section 9(f), (g) and (h) of the Labor-Management Relations Act. These provisions of the statute require that labor organizations desiring to obtain the benefits of the act shall file certain operational and financial statements with the Secretary of Labor, distribute the financial statement to their members and have their officers submit affidavits that they are not members of the Communist Party. There is nothing whatever in the evidence, however, to show that the union has not complied with these statutory requirements; and, in the absence of proof to the contrary, we must assume that they have been complied with. * * Where there is nothing to show, therefore, that the union has failed to comply with the statutory provisions, where general counsel has filed a complaint upon its petition, and where the Board has granted relief upon the complaint, we must assume that the law has been complied with. Omnia praesumuntur rite esse acta. United States v. Chemical Foundation, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131; Smith v. St. Louis & S. W. Ry. Co., 181 U.S. 248, 258, 21 S.Ct. 603, 45 L.Ed. 847."

In answer to the claim that compliance must first be shown before the Board has jurisdiction to file complaint, hear the controversy, and enter its order, the court observed: "The company contends that compliance with the statutory provisions is jurisdictional and that compliance must be shown before the Board has jurisdiction to proceed. There is nothing in the language of the statute expressly requiring this; and if such view were to be taken, it would greatly hamper the administration of the act, since it would be incumbent upon the general counsel to show compliance, not

only with the requirements as to filing affidavits but also with those requiring the giving of notice to members; and this he would have to do in every case, even though there were no question as to compliance. Surely nothing of the sort was contemplated in the passage of the statute; and it is well settled that the courts will not construe a statute in such way as to make it administratively unworkable if any other construction is possible. Haggar v. Helvering, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340; Gruver v. Com'r, 4 Cir., 142 F.2d 363, 366; Fides v. Com'r, 4 Cir., 137 F.2d 731. We think it clear that the requirement of the statute goes, not to the jurisdiction of the Board, but to the standing of the union to ask relief before it. As said by Mr. Justice Holmes in Fauntleroy v. Lum, 210 U.S. 230, 235, 28 S.Ct. 641, 642, 52 L.Ed. 1039: 'No doubt it sometimes may be difficult to decide whether certain words in a statute are directed to jurisdiction or to merits, but the distinction between the two is plain. One goes to the power, the other only to the duty, of the court. * * * Whether a given statute is intended simply to establish a rule of substantive law, and thus to define the duty of the court, or is meant to limit its power, is a question of construction and common sense.' "

In addition to the persuasiveness of the foregoing opinion, other sections of the statute, and the report of the Congressional Committee provided thereunder, are illuminating in arriving at a determination whether the failure to allege or prove compliance of the union with Section 9(f), (g) and (h) of the Act was a jurisdictional condition precedent.

Among the most important provisions of the Labor-Management Relations Act of 1947 was the creation of "a joint congressional committee to be known as the Joint Committee on Labor-Management Relations * * *, and to be composed of seven Members of the Senate Committee on Labor and Public Welfare, to be appointed by the President pro tempore of the Senate, and seven Members of the House of Representatives Committee on Education and Labor, to be appointed by

the Speaker of the House of Representatives." It was further provided that the committee should elect a chairman and vice chairman from among its members, and, acting as a whole or by subcommittee, should conduct "a thorough study and investigation of the entire field of labor-management relations, including but not limited to—

"(1) the means by which permanent friendly cooperation between employers and employees and stability of labor relations may be secured throughout the United States;

"(2) the means by which the individual employee may achieve a greater productivity and higher wages, including plans for guaranteed annual wages, incentive profit-sharing and bonus systems;

"(3) the internal organization and administration of labor unions, with special attention to the impact on individuals of collective agreements requiring membership in unions as a condition of employment;

"(4) the labor relations policies and practices of employers and associations of employers;

"(5) the desirability of welfare funds for the benefit of employees and their relation to the social-security system;

"(6) the methods and procedures for best carrying out the collective bargaining processes, with special attention to the effects of industry-wide or regional bargaining upon the national economy;

"(7) the administration and operation of existing Federal laws relating to labor relations; and

"(8) such other problems and subjects in the field of labor-management relations as the committee deems appropriate."

The purpose of the Committee, in making a thorough study and investigation of the entire field of labor-management relations, was to submit a report and recommendations for legislation, and the Act provided:

"The committee shall report to the Senate and the House of Representatives not later than March 15, 1948, the results of its study and investigation, together

with such recommendations as to necessary legislation and such other recommendations as it may deem advisable, and shall make its final report not later than January 2, 1949." Sections 401, 402, 403 of the Labor-Management Relations Act of 1947.

The Joint Committee on Labor-Management Relations made its report to Congress in 1948 (Senate Report 986, Part 3, 80th Cong., 2d Sess., page 45) and embodied its conclusions with respect to the non-Communist affidavit requirement, as follows:

"The committee believes that the non-Communist affidavit provision has already demonstrated its effectiveness as an aid to unions and their members in their desire to drive the Communists from positions of power in labor organizations. Since that point having been established beyond argument, consideration should be given by Congress to perfecting the approach to the problem. Communists do not give up easily and have and will take quick advantage of any loopholes which appear in the law. Control of the labor movement has been the Communists' most effective means of gaining ultimate control of the government itself in many European countries.

"The committee wishes to emphasize as strongly as possible that in any consideration of amendments to this section, great care must be given to prevent litigation of the question in Board hearings. If the parties to Board hearings are permitted to question the veracity of the affidavit, or the fact as to it having been filed, records will be hopelessly overburdened with such proof. Board hearings must be confined to evidence going into merits of the case at hand if the Board is to carry out is real function of deciding unfair labor practice cases and determining bargaining representatives. The Board recognized this principle in Lion Oil Co. (15—R—2264) when it upheld the ruling of the hearing officer in his denial of the employer's motion to dismiss the petition since the record did not show the petitioning union had complied with the requirements of section 9(f) and (h). The Board said that compliance is clearly for the Board to determine and its official records indicated that the union had complied."

In the Lion Oil Co. case mentioned and approved in the Committee's report (76 N.L.R.B., pages 565, 566), the Board had stated, in its decision:

"The Employer further contends that the petition should be dismissed because the Congress of Industrial Organizations, with which the Petitioner is admittedly affiliated, has not complied with the filing requirements of Sections 9(f) and (h) of the Act. We have affirmed the hearing officer's denial of the motion to dismiss for the reasons detailed in Matter of Northern Virginia Broadcasters, Inc., 75 N.L.R.B. 11.

"The Employer also argues that, as the record does not affirmatively show that the Petitioner has complied with the requirements of Section 9(f) and (h), the petition should be dismissed. In view of the language of those sections, however, precluding *the Board* from investigating any question concerning the representation of employees where the requirements have not been met, the matter of compliance is clearly one for the Board to determine in any manner suited to the circumstances. As the official records of the Board indicate that the Petitioner has complied with the requirements of those sections, the hearing officer's denial of the Employer's motion to dismiss was proper."[1]

1. The decision in Northern Virginia Broadcasters, Inc., referred to in the Board's decision in the Lion Oil Co. case, was summarized in the report of the Joint Committee on Labor-Management Relations, as follows: "The issue was presented to the National Labor Relations Board in the case of Northern Virginia Broadcasters, Inc. (75 N.L.R.B. No. 2). Local 1215 of the International Brotherhood of Electrical Workers, AFL, had filed a petition for a collective bargaining election. Both local 1215 and the International Brotherhood of Electrical Workers had filed the required affidavits and had complied with the registration requirement. Pursuant, however, to the ruling of the general counsel, the regional director dismissed the petition because the officers of the parent AFL had not

In National Labor Relations Board v. Postex Cotton Mills, Inc., 5 Cir., 181 F.2d 919, it was held that where officers of a parent union had not filed required non-Communist affidavits provided for in the National Labor Relations Act, the Board was not authorized to issue a complaint upon a charge filed by an affiliated union, notwithstanding that the officers of the affiliated union had filed the required affidavits. A contrary construction was reached in West Texas Utilities Co. v. National Labor Relations Board, D.C.Cir., 184 F.2d 233; and in National Labor Relations Board v. Highland Park Mfg. Co., 4 Cir., 184 F.2d 98, the court considered the two foregoing cases and agreed with the construction of the court in the Postex case. While the Highland Park case is cited by respondent as authority in the instant case, it is not here applicable for the same question is not before this court. The issue here is whether compliance with Section 9(f), (g), and (h) of the Act is jurisdictional and must be shown before the Board has jurisdiction to proceed. Judge Parker, who wrote the opinion of the court in the Greensboro Coca Cola Bottling Co. case, supra, holding compliance not jurisdictional, as well as in the Highland Park case, was obviously of the view that the two cases were concerned with entirely different issues, with which conclusion we are in accord.

Respondent submits that the above mentioned portion of the report of the Joint Congressional Committee on Labor-Management Relations is not persuasive of the interpretation to be given to the Act, since this was not the committee that proposed its adoption, but, rather, one created by the Act itself; that the opinions rendered by such committee are *ex post facto* and have no weight or significance in interpreting the provisions of the statute; and that its views, as set forth in its report, are not persuasive as to Congressional intent in the matter.

For the past fifteen years since its passage by Congress, the National Labor Relations Act has aroused perhaps more controversy than any statute enacted during that period. Continuous debates in Congress finally led to the amendment of the law, through the enactment of the Labor-Management Relations Act, known as the Taft-Hartley Act, in 1947. Congress at that time was deeply concerned with the manner in which the amended Act would operate and, accordingly, as mentioned above, the Act provided for the Joint Congressional Committee to carry on a continuing thorough study and investigation of labor-management relations, including the administration of the federal laws relating to labor relations, with the object of reporting back to Congress the results of its investigation, together with recommendations for further legislation on the subject. Among the members of such Joint Congressional Committee, it is to be noted, were Senator Taft and Representative Hartley, authors and sponsors of the Labor-Management Relations Act which bore their name. The report of the Committee was made in the first part of 1948; and since that time, there have been two national Congressional elections in which one of the principal issues was the Taft-Hartley Act. Debates have continued with regard to this legislation both in the Senate and the House of Representatives; but no amendments have been made by Congress with respect to the so-called compliance sections here in question. Under such circumstances, we consider this to be persuasive evidence of the adoption by Congress of the construction given the filing requirements here in question by the Board, in the Lion Oil Co. case, supra, which was set forth in the report of the Joint Congressional Committee. In fact, most reasonable inferences can be drawn that the construction of the statute contended for by the respondent in the Lion Oil case, like that contended for by respondent in the instant

---

filed non-Communist affidavits and a registration statement. The union appealed to the Board to reverse the action of the regional director in dismissing the petition. The Board, acting on the appeal,

in a divided opinion set aside the dismissal and reinstated the union's petition." (Senate Report No. 986, 80th Cong., 2d Sess., Part 1, page 11.)

case, failed of Congressional approval. See Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796; State of Missouri v. Ross, 299 U.S. 72, 57 S.Ct. 60, 81 L.Ed. 46; United States et al. v. American Trucking Ass'ns, Inc., et al., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345. Moreover, it is to be said that respondent's contention that compliance with the filing requirements must be shown before the Board has jurisdiction to proceed, is in conflict with the explanation given by Senator Taft to the Senate when he declared that under Section 9(f) of the Act, the financial reports required to be filed by the unions were not to be available to the public.[2]

From the foregoing, it is our conclusion that it was not necessary to allege and prove compliance on the part of the union with the requirements of Section 9(f), (g), and (h) of the Act as a condition precedent to the exercise of jurisdiction over the controversy by the Board. It may be remarked that, although the fact does not appear in the record, it is submitted by the Board that the American Federation of Labor, the parent union in this case, was in full compliance with Section 9(f), (g), and (h) of the Act prior to the issuance of the complaint against the respondent. But that is unnecessary to consideration in this case, in view of our holding that the Board was not required to allege and prove compliance, and that compliance with such provisions was not jurisdictional.

Having disposed of the foregoing jurisdictional question, we agree that it is unnecessary to pass upon petitioner's further contention that failure to comply with the above mentioned filing requirements does not present a litigable issue in that they are administrative provisions not subject to review.

■■■ On the merits, respondent contends that there was insufficient admissible evidence to sustain the order of the Board that respondent was guilty of unfair labor practices.

The evidence discloses that in December, 1947, a strike for a wage increase occurred at respondent's premises. The superintendent sent the strikers home without attempting to negotiate, and afterwards called them separately by phone and asked them if they would return to work at the old wage rate, stating that the others were returning to work on that basis. However, employees Reed and Lolmaugh were not recalled to work. The superintendent and the foreman had informed respondent that they were of the opinion that "these two girls had led in this rather insurrection and had been the ringleaders of the movement to shut down and demand more pay." When they called the office to inquire why they had not been notified to return to work, they were told that they had been replaced and were not needed. Their positions had been filled by new employees. The Board held that they were discriminated against in not being recalled to work because of respondent's belief that they were the leaders of the strike; that this was an unfair labor practice; and that the employees were entitled to reinstatement. Respondent contends that the Board's finding of discrimination in the treatment of the two employees in question is not sustained by the evidence, and that it is not an unfair labor practice for an employer to neglect to rehire strikers when their positions have been filled by replacements; that these employees were not singled out for discrimination, but that their places were filled by other employees obtained from the lists of the Unemployment Compensation Commission, who, he thought, would be better workers. It is an unfair labor practice for an employer, in reinstating employees who have been on strike, to exclude certain of them because of their union activities. National Labor Relations

---

2. In explaining the bill, Senator Taft said: "The bill provides that unions must file financial reports on forms certified by the Secretary of Labor and furnish the reports to all of their members, and file a copy with the Secretary of Labor. Such reports are not open to the public, any more than corporation reports are open to the public; but they are open to inspection by the members, and they are also open to proper Government officials. There is no special provision, but they are not specifically provided to be open to the public." 93 Cong. Rec. 3839.

Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. There was evidence from which inferences could be drawn that respondent practiced such discrimination against the employees in question in the belief that they were the ringleaders of the strike. While this evidence was not persuasive in the mind of the trial examiner who recommended that the complaint be dismissed as to the employees in question, we can not say there was no evidence to justify a contrary conclusion by the Board. Inferences to be drawn from the evidence are for the Board, and not the court, to make, and, if supported by evidence, are not to be set aside even if a contrary inference would have been drawn by the court. National Labor Relations Board v. Ford et al., 6 Cir., 170 F.2d 735.

 With reference to the discharge of other employees of respondent, it appears that in January, 1948, a so-called union "organizational" meeting was held among the employees, during which some of them became union members. A few days later, four of the members of the union were discharged by respondent. On the day of these discharges, according to the testimony, respondent inquired of one employee as to whether he belonged to the union and whether he had attended the organizational meeting; and respondent declared, during the conversation, that he would close down the department if its employees joined the union. After one of the union members, Maluske, had been discharged, respondent, according to the testimony, asked another employee if he knew who else was helping organize the union in addition to Maluske, whom he had just fired. Later, he told such employee that he had found out who the other leader of union activities was, referring to employee Kalmbach—that "fellow back by the folders"—stating that it would take about two minutes to get rid of him. Later, when Kalmbach was being interrogated by a former superintendent of the plant, who was still in respondent's employ as a salesman, as to his union connections, respondent came into the room and abruptly discharged him, saying that if he felt like that, he could "get out the door. If you like the Union so much let the Union get you a job." Eva Berry, another employee, was questioned twice on the day of her discharge about her union activities, first by the forelady, and then by respondent. At first, employee Berry denied she had joined the union, but when respondent asked her to swear that she had not joined, she refused to do so. When employee Berry indicated that she would join the union if it would benefit her, respondent stated that he was the one who gave her a job and not the union, and shortly after this interchange, she was discharged. On the same day, employee Hanselmann, who had joined the union four days before, was discharged although he had received three pay raises and had been praised for his work during the year of his employment. Respondent claimed that Maluske was discharged because he was inexperienced, and not a good production man; that Eva Berry was discharged because of excessive smoking, and because she affirmed her intention of participating in another shutdown; that Kalmbach was a grumbling, discontented employee; and that Hanselmann's employment was terminated because of lack of work. The probative value of testimony by an employer regarding reasons for discharge of an employee is for the Board, and if such testimony is substantially contradicted by other evidence and accompanying circumstances, the Board is not required to accept it. We can not say there was not, here, such evidence and accompanying circumstances.

As to the claim that the trial examiner should have stricken and disregarded the testimony of Eva Berry concerning her conversation with respondent on the ground that she herself denied that it contained any threat of reprisal or promise of benefit, it is clear that what was said bore upon the question whether she was later discharged on account of her favorable attitude toward the union. It was for the Board to determine whether her discharge resulted from what she said to the respondent about the union. Even where an employee testified that he knew of no reason for his discharge other than that he had

violated a rule of respondent's company, the Board was not precluded from showing that another reason existed for his discharge. National Labor Relations Board v. Ford et al., supra. An examination of the record reveals that there was substantial evidence to support the finding of discriminatory discharges of these employees in violation of the Act.

Respondent further contends that his operations did not affect commerce. Respondent is an individual carrying on a commercial letterpress printing business in Ann Arbor, Michigan, and employing approximately 100 persons in his office, composing room, press room, bindery, and shipping department. During the calendar year of 1947, his production consisted of periodicals, school annuals, trade magazines, and journals, booklets, and folders for the University of Michigan, as well as advertising material such as catalogues and automotive parts books. Sales of these materials amounted to $850,000, of which $190,000 was composed of periodicals mailed by respondent to points throughout the United States. During the same year, respondent purchased raw materials and repair parts of the approximate value of $22,000 from points outside the State of Michigan. The business was heretofore operated as a partnership, during which time its operations were considered by this court in National Labor Relations Board v. Prettyman et al., 117 F.2d 786, in which it was held that the same business enterprise, on the basis of its operation in 1937, sufficiently affected interstate commerce to bring it within the National Labor Relations Act. Since that time, the magnitude of such operations has been considerably expanded. In view of the foregoing, there can be no doubt that respondent's operations affect interstate commerce within the meaning of the Act.

Respondent further argues that the Board was without power to hear and determine the controversy because of an asserted failure to comply with Section 10(b) of the Act, which provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made". It is claimed that there was lack of jurisdiction in this case because of defective service, due to the fact that a copy of the charge was served upon respondent by the regional director of the Board by registered mail, instead of being personally served by the union.

Section 11(4) of the Act provides: "Complaints, orders, and other process and papers of the Board, its member, agent, or agency, may be served * * * by registered mail * * *. The verified return by the individual so serving the same setting forth the manner of such service shall be proof of the same, and the return post office receipt * * * therefor when registered and mailed * * * as aforesaid shall be proof of service of the same. * * *"

In National Labor Relations Board v. O'Keefe & Merritt Mfg. Co. et al., 9 Cir., 178 F.2d 445, the court held that service of a notice by registered letter addressed to each individual respondent, in accordance with Section 11(4) of the Act and the rules of the Board, was a form of notice reasonably calculated to give respondents knowledge of the proceedings and the opportunity to be heard, and, as such, satisfied the requirements of due process. Respondent differentiates this case, however, contending that a "charge" does not come within the classification of "other process and papers of the Board," as set forth in Section 11(4) of the Act, because of the fact that it is an instrument initiated by the charging party, the union, and that since Section 10(b) requires notice of such a charge "upon the person against whom such charge is made," personal service is necessary. In according a practical construction to the foregoing provision of the statute, we are of the view that, since all complaints, orders, and other processing papers of the Board may be served by registered mail, the charge that sets in motion the machinery of the inquiry by which the Board is enabled to enter intelligently upon the exercise of its powers, is also to be served in the same way, and Section 10(b) is not to be construed as requiring personal service.

As to service by the regional director instead of the union, while Section 10(b) does not specify by whom the charge is to be served, it can not be maintained that the Board, as well as the charging party, does not have an interest in the matter. It is of no concern to the respondent whether service is made by the Board or the union. Although, according to the Board's rules and regulations, the charging party is responsible for the timely and proper service of a copy of the charge, it is provided that the regional director will, as a matter of course, cause a copy of the charge to be served upon the person against whom the charge is made, but shall not be deemed to assume responsibility for such service. It is further provided that the regional director will, on the request of the charging party, or may in any case, cause a copy of the charge to be served upon the person against whom the charge is made; but timely service thereof is the exclusive responsibility of the charging party.[3] In authorizing the regional director to serve a copy of the charge, the Board did not act in excess of its rule-making power to make such regulations as might be necessary to carry out the provisions of the statute. Section 6 of the Act. Title 29 U.S.C.A., § 156.

The Board's order requires respondent to cease and desist from discouraging membership in the union, or any other labor organization, by discriminating in regard to the hire and tenure of employment of his employees; from interrogating his employees as to their union activities, views, sympathies, or membership; from threatening to close his plant should his employees form a union; and from in any other manner interfering with, restraining, or coercing his employees in the exercise of their rights to engage in concerted activities. Affirmatively, the Board's order requires respondent to offer reinstatement, with back pay, to employees Reed, Lolmaugh, Berry, Kalmbach, Hanselmann, and Maluske, and to post specified notices. Under the evidence and findings of the Board, the foregoing order was proper.

With respect to the claims that the record was distorted because of errors committed by the trial examiner in rulings on the admissibility of evidence, the exclusion of evidence, the receipt of inadmissible evidence, and because of reliance on matters outside the record, and arbitrary action in discrediting the testimony of a witness for respondent, we find, upon a review of the record, that such contentions are insubstantial and without merit.

In accordance with the foregoing, a decree will be entered enforcing the order of the Board.

3. Section 203.14 of Rules and Regulations of the N.L.R.B., and Section 202.4 of the Statements of Procedure of the Board, Series 5, Subpart G, effective August 22, 1947.